TEXTO COMPLETO DE LA RESOLUCIÓN
El peticionario Sr. Ramón Hernández Rodríguez (en adelante, “señor Hernández” o “peticionario”) recurre de la Resolución emitida el 16 de enero de 2007, notificada el día 17 de ese mes y año, por el Tribunal de Primera Instancia, Sala de Mayagüez (en adelante, “TPF). En ésta, el TPI declaró Sin Lugar la solicitud presentada por el señor Hernández, sobre desestimación de dos acusaciones, fundamentada en que la determinación de causa probable para acusar no fue conforme a la ley y a derecho.
I
Surge del recurso, que contra el señor Hernández se presentaron dos (2) denuncias por hechos ocurridos el 26 de septiembre de 2006, en Mayagüez, Puerto Rico. Los cargos imputados fueron infracción al Artículo 106 del Código Penal (asesinato en primer grado) y al Artículo 5.05 de la Ley de Armas de Puerto Rico, 25 L.P.R. A. § 458d (delito grave). Las denuncias leen como sigue:

“Denuncia por: Art. 106 del Código Penal de Puerto Rico

El referido imputado, Ramón Hernández Rodríguez, allá en o para el día 26 de septiembre de 2006 y en ■Mayagüez, Puerto Rico... ilegal, voluntaria, maliciosa y criminalmente, dio muerte al ser humano, Ignacio Vicens Díaz, menor de edad, con intención de causársela, mediando premeditación consistente en que el imputado, utilizando un arma blanca punzante con la cual le infirió dos heridas punzantes en el área del pecho, las cuales le provocaron la muerte. Hecho contrario a la Ley. ”

Denuncia por: Art. 5.05 de la Ley de Armas de Puerto Rico

El referido imputado, Ramón Hernández Rodríguez, allá en o para el día 26 de septiembre de 2006 y en Mayagüez, Puerto Rico... ilegal, voluntaria, maliciosa y criminalmente, poseía sobre su persona para fines de ofensa y defensa, la cual sacó, mostró, y usó, un arma blanca consistente en que usando objeto punzante y al portar la misma no lo hacía sin que fuera en ocasión de su uso como un instrumento propio de un arte, 
*1166
profesión, deporte, ocupación u oficio. Siendo un arma con la cual se puede causar grave daño corporal y hasta la muerte a un ser humano. Dicha arma fue utilizada para cometer el delito de asesinato en primer grado al ser humano Ignacio Vicens Díaz, menor de edad. Hecho contrario a la Ley. Petición de Certiorari, Ap. I y II, a laspágs. 1-2.”

Determinada causa probable para arresto en los dos cargos imputados, el 23 de octubre de 2006 se celebró la vista preliminar, en la que declararon por parte del Pueblo los agentes de la Policía de Puerto Rico, Luis Vélez Borrero y Ramón Mendret Segarra, el Policía Municipal Marcos Mzarry Mercado y la Sra. Jocelyn Rivera Torres. Según surge de la transcripción de la prueba de dicha vista, en lo pertinente, éstos declararon que:
Primer testigo: Agente Luís Vélez Borrero
[El 26 de septiembre de 2006, de 8:30 a 9:00 de la noche, realizaba junto a mi compañero, el Agente Alfonso Rivera, un patrullaje en motora hacia el área de las Parcelas Soledad, en Mayagüez]. Cuando estábamos llegando a un cruce, vemos... las luces de un vehículo y enfocando con la motora vemos dos individuos en un forcejeo... [intervenimos con los caballeros. Había una guagua Pathfinder y había dos individuos. Uno de ellos al frente y el otro atrás tratando de detener al otro. [El que iba al frente era Ramón Hernández Rodríguez]. El de atrás tenía una camisa blanca y estaba todo ensangrentado... [Tjratando de detener al que estaba al frente, pues pasamos a darle el alto a los dos, principalmente al que iba al frente, porque aparentaba el de atrás aguantarlo. Pasamos a detenerlo y ponerlos bajo arresto a los dos...
Pongo en el suelo a [Hernández], porque... no aparenta estar herido... [Ignacio] cuando veo que no está en el suelo, veo que hay unas luces de frente y se desploma... [Las luces correspondían a] la patrulla Municipal que venía, estaba llegando en ese mismo momento también. [Era el Agente] Marcos Irizarry...
Comenzamos a preguntarle a [Hernández] qué había pasado...y él no decía nada. [Ignacio] estaba herido, no salían palabras tampoco de él... [V]erifique el vehículo que estaba estacionado a varios metros de donde estábamos, no había nada, no había nadie... [C]ontinué preguntándole a [Hernández] qué había pasado y no decía nada... [Ignacio] trataba de levantarse. [L]e preguntábamos también y él lo que hacía [era] señalar para que [Hernández] dijera si era él, miraba hacia él. [T]rataba de incorporarse y nosotros tratábamos de incorporarlo para que cogiera aire y señalaba hacia [Hernández]...
[Hernández] no decía nada, estuvo en el piso hasta que llegó la ambulancia. [L]o verificaron, [p]orque tenía sangre en el pantalón, en la ropa, [para] ver si estaba herido, pero cuando lo verificaron cortaron el pantalón [y] no tenía ninguna herida...
[Ignacio] falleció. Llegó la ambulancia del Estado y le pusieron la máquina de EKG y no dio signos de vida... A la escena [llegó el padrastro de [Ignacio, lo] reconoció como su hijastro, que le decían Nacho.
[Al acercarme a la guagua, lo] que veo es sangre en los asientos de al frente... en el asiento de atrás muchos papeles... [Había] [s]angre en los asientos de al frente [y] papeles en los asientos de atrás. Donde había sangre era en la consola, donde pude percatarme donde más sangre había, en las esquinas de los espaldares... No [vi sangre en el asiento de atrás]. Petición de Certiorari, Ap. VII, a las págs. 12-27.
Segundo testigo: Policía Municipal Marcos Irizarry Mercado
[El 26 de septiembre de 2006] tomé servicio a las 8:00 de la noche y mi supervisor, Rivera, me indicó que pasara al área de Soledad, Parcelas Soledad... [para] dar rondas preventivas en el área... Yo llegué a las Parcelas Soledad, di las rondas preventivas...y cuando voy saliendo de las Parcelas Soledad por la Calle G, me detiene *1167 un vehículo tipo RAM y, desde el interior del vehículo, una persona me hace señales que me detenga con la mano afuera. Me detuve y me indican que en la entrada del aeropuerto habían unos jóvenes enfrentándose, confrontándose y me indican que eran dos individuos. Le tire a las patrullas y encendí todos los focos de la patrulla mía... y continué la marcha allá, [h]acia la entrada del aeropuerto.
Cuando voy de camino hacia allí, que estoy llegando al área, puedo observar dos biombos de motora que venían, que estaban en el área, y veo a un joven que cae al piso, de vestimenta blanca, y al otro lado el joven en el piso, boca abajo. Yo iba en mi dirección solo, no venía nadie en contra mía. No había nadie en el camino.
Me bajé de la patrulla. Fui hasta el área donde estaban los jóvenes en el piso y me acerqué a ellos. Traté de hablarle al joven que estaba herido, pero no me respondía. Fui al otro joven que estaba boca abajo y le insistí en varias ocasiones qué... si había pasado algo que me dijera... y no me respondía. Me levanto y vuelvo donde el joven que está herido y le pregunto en varias ocasiones, pero éste no me puede hablar, como que se ahoga en la sangre, y regreso al área donde está el otro joven, me pongo de rodillas y le pregunto que qué había pasado, si había pasado algo, que si había alguien más y él no me contesta. Observo que el joven que está herido, porque él estaba boca abajo primero y luego se viró, lo que hizo fue que se puso las manos en el pecho y trataba de sentarse y observaba al otro joven, [a Hernández], y en varias ocasiones que le pregunté a este joven lo que pasaba, el otro joven, el herido, se aguantaba el pecho y me trataba de hablar, pero como no podía, lo que hacía era que miraba a este joven... [Lo miraba de] una manera insistente, como de decirme, pero como no podía, me señalaba con la cabeza. [Después,] uno de los compañeros me indica que el joven estaba 10/7, que había muerto. Yo observo al joven herido y definitivamente estaba muerto ya. No estaba respirando. [Entonces, el] joven aquí presente, [Hernández], comenzó a decir que había una tercera persona, que le había dado pon... Que le habían dado pon a otra persona y que esa persona le había dado unos palos... Yo lo que hice fue que le comuniqué a los muchachos y luego este individuo, [Hernández], dice que había sido con un cuchillo. Él estaba nervioso y presentaba sangre en la ropa... Más tarde, cuando los agentes de homicidio verificaron el cuerpo del joven muerto, yo observé, además] de los dos orificios en el área del pecho, una mordida en uno de los brazos...
[S]e podía observar sangre desde el lado de la puerta del pasajero, se podía observar sangre adentro del vehículo... [Había sangre en] el asiento del conductor y entre el conductor y el pasajero... Petición de Certiorari, Ap. VE, a las págs. 27-46.
Tercer testigo: Agente Ramón Mendret Segarra
[El 26 de septiembre de 2006 a] eso de las 9:00PM recibí una llamada de mi supervisor [para] que pasara a la carretera 342 [de Mayagüez], que había una persona muerta. [Fui] con el Agente Millán [y] el Técnico de Homicidios, para investigar esos hechos. [Cuando llego a la escena] veo en el medio de la carretera un joven, blanco, de unos 6 pies y pico de estatura, que había... fallecido... [L]a investigación que realizamos me indica que había una segunda persona que se la habían llevado para el Hospital San Antonio. [Y]o entendía que era otra persona herida, de primera intención me indicaron eso. [N]osotros cubrimos la escena del muerto... investigamos, entrevistamos todas las partes [y] verificamos la persona muerta. [H]abía un vehículo Nissan Pathfinder del 2000, se midió la distancia de donde estaba la persona...
Al percatamos y verificar el cuerpo, el joven presentaba 2 heridas punzantes en el pecho, presentaba una mordida... Por la cantidad de sangre y la condición donde se encontraba, cuando levantamos el t-shirt del joven vimos que las heridas eran punzantes, que es diferente cuando es herida de bala... Esa noche hicimos una búsqueda [del arma], pero por la condición del lugar, [d]emasiado oscuro, boscoso, hay mucha hierba, [no se encontró]... [Además de la] mordida en el brazo derecho, tenía unos raspasos en la rodilla, que entendemos fue cuando se cayó. [S]e verificó, no presentaba ninguna otra herida... El padrastro, el Sr. Santos Vélez, [identificó el cuerpo que resultó ser de] Ignacio Vicéns. [De acuerdo a la investigación, Ignacio Vicéns tenía] 17 años, vivía consensualmente con una joven que tiene 4 meses de embarazo, trabajaba en el garaje...
*1168 Nosotros llegamos al hospital y [Hernández] se sentía aparentemente intranquilo, nervioso... Nosotros lo llevamos para entrevistarlo [Relacionado a esos hechos, ya que era la persona que se encontraba en el lugar con Ignacio y era la persona que tenían detenida o habían localizado en esos momentos... [L]o único que él decía [era]: yo le dije que no le diera pon, yo le dije que no le diera pon”. ¿Pero a quién? “A una persona que iba por la carretera y él paró y le dio pon...”. ¿Pero tú no lo miraste? Y me dice “no”. Toda la información que él me daba no era cónsona con lo que nosotros vimos en el lugar de los hechos. Porque él, Ramón, me indicaba que cuando suceden los hechos yo le digo a él, ¿pero qué le pasó a Ignacio?, me dice “a él le pasó algo ahí y yo grité y cuando paró el auto yo me paré y lo halé”....
Él en todo momento estaba siendo bien incongruente, decía una cosa en este momento y después decía otra. [Como acostumbro en nods investigaciones, le pedí que me explicara] lo que hizo en el día desde que se levantó; incluso pues él me lo escribió entonces. [N]o guardaba similitud en base a la investigación que yo hice. [Yo corroboré esa información y] la información no era cierta a lo que él me estaba diciendo... Lo primero, cuando yo lo llevo a mi oficina él me indica a mí... que él no vio a la persona que se montó, que Ignacio le dio pon, lo primero. Yo le digo, “¿cómo es posible que tú, que una persona se monte en el vehículo y tú no lo veas?”. [Ejntonces dice: “porque él estaba mirando hacia juera”. Luego nuevamente le pregunto al caballero y me dice que era una persona bajita, gordita. De primera intención decía que no lo vio, después estaba describiendo otra persona. Luego yo veo que no está diciendo la verdad. [P]ara mí, en mi investigación, porque yo le pregunto, ¿y Qué pasó? . Me dice: “se detuvo el vehículo e Ignacio, como le dicen Nacho, se volteó a pelear con el joven que está atrás”. Ignacio recibió dos puñalás. La guagua, el espaldar de la guagua, es una guagua alta. ¿Cómo es posible que Ignacio reciba dos puñaladas donde no tiene ningún rasguño el espaldar de la guagua?... [El espaldar de la silla del chofer] no tiene ningún tipo de rasguño de armas, ninguna, no tiene sangre. [L]a sangre de Nacho estaba en el medio de los dos asientos y en el asiento del pasajero.
[Examinado el cuerpo de Ignacio, en] el pecho, en la parte de al frente, lleno de sangre, en la espalda ninguna. El caballero aquí, [Hernández], su ropa estaba lleno de sangre al frente, la camisa, el pantalón en la parte de atrás. Él dice que sacó a Ignacio de la guagua por la espalda, pero la espalda de Ignacio no tenía sangre ninguna, ni la ropa tampoco tenía sangre y ¿por qué si él tenía sangre, en su ropa Ignacio no tenía sangre en la espalda? Una revista, una gorra [era el contenido] en el asiento de atrás del chofer. [Estaban] normales, bien, como si nadie se hubiera sentado. [El tapete del pasajero de atrás del chofer] no tenía sangre, nada. [Esa puerta estaba] cerrada...
[Hernández] me indica que él salió a eso de las 6:00 de la tarde a 7:00 de su residencia. Por escrito me lo hace. Que se levantó a eso de las 11:00 de la mañana. Estuvo todo el día compartiendo con la su familia. Que durante la tarde, a eso de las 6:00 de la tarde, salió para el barrio donde él vive a dar una vuelta y se paró frente, primero dijo el parque y después dijo la cancha de baloncesto, que había jugado baloncesto. Luego de eso él me indica que a eso de media hora Nacho lo llama... para que él lo acompañe a comprar leche y soda al garaje del padrastro y que él lo acompañó y fue cuando la situación... [Yo entrevisté a la madre de Hernández y lo narrado por él con relación a lo que dijo su madre] no era lo mismo... [Tampoco] comprar[ó] con lo que la mujer [de Ignacio] me indicó. Petición de Certiorari, Ap. VII, a las págs. 46-70.
Cuarto testigo: Sra. Jocelyn Rivera Torres
[Ignacio fue] mi compañero. [Convivimos por] [t]res meses. Ahora mismo estoy embarazada de 3 meses y medio. [El 26 de septiembre de 2006] [prácticamente él fue a casa a comer y salió. No [se a dónde], [L]legó... como las 8:00 a casa. El se bañó y lo llamaron por teléfono... Al celular. Yo estaba al lado de él. En la cama. [A]ntes de contestar la llamada él dice: “ya está Lalo otra vez llamándome”... Verdaderamente no sé lo que [Lalo] le dijo, pero Nacho se negó como 3 a 4 veces que no iba a bajar... [Decía] que no iba a bajar, que él había subido ya a casa. [Luego,] Nacho le dice “dame como 15 minutos y en 15 minutos pues yo bajo”. [Le dijo a] Lalo, con quien estaba hablando... Nacho salió de la casa y desde ahí nada... Eran como las 8 y pico, 8:15 *1169 por ahí, 8:20.
[A Lalo lo] he visto... en la gasolinera. 
Sometido el caso, el 23 de octubre de 2006 se determinó causa probable para acusar en los dos cargos imputados. Conforme lo anterior, el 1 de noviembre de 2006 se presentaron las acusaciones correspondientes. 
Inconforme, el 14 de noviembre de 2006, el señor Hernández solicitó ante el TPI la desestimación de las acusaciones, bajo las disposiciones de la Regla 64(p) de Procedimiento Criminal. En ésta argüyó que la determinación de causa probable por estos delitos no fue conforme a la ley y al derecho. En síntesis, alegó que de la prueba desfilada durante la vista se desprende una ausencia total de los elementos de los delitos de asesinato en primer grado y posesión y uso de armas blancas. Además, argüyó que faltó establecer la conexión de los delitos con el imputado, elemento indispensable para la válida determinación de causa para acusar. Por su parte, el 5 de diciembre de 2006, el Ministerio Público se opuso a la desestimación solicitada.
Como hemos informado, el 16 de enero de 2007, el TPI emitió la determinación objeto del presente recurso, declarando Sin Lugar la desestimación solicitada. Inconforme, el 30 de enero de 2007, el señor Hernández presentó ante este Tribunal oportuno recurso de Certiorari, señalando que:

“Erró el Honorable Tribunal de Primera Instancia al declarar No Ha Lugar la solicitud de desestimación de las acusaciones por asesinato en primer grado del nuevo Código Penal e infracción al Art. 5.05 de la Ley de Armas, aun cuando se estableció que durante la vista preliminar existió ausencia total de prueba y no se estableció la conexión del [peticionario] con los delitos imputados, en clara contravención al derecho constitucional de presunción de inocencia, al debido proceso de ley, al principio de legalidad y a los artículos 22, 23 y 106(a) del nuevo Código Penal. ”

II
La Regla 23 de Procedimiento Criminal, 34 L.P.R.A, Ap. II, R. 23, establece la vista preliminar con el propósito de evitar que un ciudadano sea sometido de forma arbitraria e injustificada a los rigores de un proceso criminal. Mediante esta vista adversativa se determina si el Estado tiene suficiente prueba para continuar con el proceso judicial. Pueblo v. Rivera Rodríguez, 138 D.P.R. 138, 142-143 (1995); Pueblo v. López Camacho, 98 D.P.R. 700, 702 (1970).
En su dinámica interna, la vista preliminar funciona a base de probabilidades, esto es, si es probable que se haya cometido el delito y si probablemente fue cometido por el imputado. De ahí que no exista una determinación final de inocencia o culpabilidad en esta etapa. Tal determinación se hace en el juicio propiamente. Rivera Rodríguez, supra, a la pág. 143; Pueblo v. Rivera Alicea, 125 D.P.R. 37, 41 (1989); Pueblo v. González Pagán, 120 D.P.R. 684 (1988); Pueblo v. Figueroa Castro, 102 D.P.R. 279, 284 (1974).
De otra parte, la Regla 64 (p) de Procedimiento Criminal, 34 L.P.R.A. Ap. II (en adelante, “Regla 64 (p)”), provee al acusado un mecanismo procesal para solicitar la desestimación de una acusación, entre otros, por: (1) insuficiencia del quántum de prueba presentado por el fiscal para establecer la causa probable; y (2) errores cometidos durante el procedimiento seguido en la vista preliminar. En lo pertinente, la Regla 64 (p) dispone lo siguiente:

“La moción para desestimar la acusación o la denuncia, o cualquier cargo de las mismas, sólo podrá basarse en uno o más de los siguientes fundamentos:

(p) Que se ha presentado contra el acusado una acusación o denuncia, o algún cargo de las mismas, sin 
*1170
que se hubiese determinado causa probable por un magistrado u ordenado su detención para responder del delito con arreglo a la ley y a derecho. ”

Es decir, para que la determinación de causa probable se haga por el juez instructor conforme a la ley y a derecho en una vista preliminar, el juicio del magistrado debe basarse en alguna prueba (lo que se necesita es una “scintilla” de evidencia) que demuestre que existe causa probable para creer que el acusado cometió el delito. Pueblo v. Andaluz Méndez, 143 D.P.R. 656, 662 (1997); Pueblo v. Rodríguez Aponte, 116 D.P.R. 653, 664 (1985); Pueblo v. Estévez Rosado, 110 D.P.R. 334 (1980); Vázquez Rosado v. Tribunal Superior, 100 D.P.R. 592, 593 (1972).
Bajo la Regla 64(p), la desestimación de la acusación procede únicamente cuando existe una “ausencia total de prueba que demuestre la existencia de causa probable para creer que el acusado cometió el delito que se le imputa”. Pueblo v. Tribunal Superior, 104 D.P.R. 454, 459 (1975). Es por ello que el Ministerio Público está obligado a demostrar, durante la vista preliminar, que tiene prueba contra el imputado, que establece todos los elementos del delito denunciado. Rivera Rodríguez, supra, a la pág. 143. Sin embargo, debe quedar claro, como lo ha establecido nuestro Tribunal Supremo, que la vista preliminar no es un mini-juicio. Rodríguez Aponte, supra, a la pág. 664.
Por ende, siempre que la prueba establezca de manera prima facie los elementos del delito, el fiscal no tiene que presentar toda su prueba en dicha vista. Rivera Alicea, supra, a la pág. 42. En esta etapa, el Ministerio Público no tiene que probar su caso más allá de duda razonable. Figueroa Castro, supra, a la pág. 284. Basta que se presente “alguna prueba que demuestre que existe causa probable para creer que el acusado cometió el delito” imputado. Vázquez Rosado, supra, a la pág. 594. En otras palabras, la responsabilidad del Ministerio Público se cumple con presentar prueba que demuestre que es probable que determinado delito ha sido cometido y que es probable que dicho delito lo cometiera el imputado. Pueblo v. Ortiz Vega, 149 D.P.R. 363 374-375 (1999).
Así pues, la determinación de causa probable en vista preliminar goza de una presunción de corrección. Pueblo v. Ocasio Hernández, 139 D.P.R. 84, 87 (1995); Rivera Alicea, supra, a la pág. 42. Sólo procede la desestimación bajo la Regla 64(p) en “ausencia total” de prueba contra el acusado. Andaluz Méndez, supra, a la pág. 662; Vázquez Rosado, supra, a la pág. 594.
III
El análisis adecuado para determinar la corrección de una resolución que declara no ha lugar la desestimación de la acusación al amparo de la Regla 64(p), requiere examinar la prueba de cargo y la prueba de defensa vertida durante la vista preliminar.
En el caso de marras, el Ministerio Público presentó como prueba el testimonio de los agentes de la Policía de Puerto Rico, Luis Vélez Borrero y Ramón Mendret Segarra, el Policía Municipal Marcos Irizarry Mercado y la Sra. Jocelyn Rivera Torres. Al evaluar las declaraciones que los testigos hacen ante un tribunal, debe tenerse presente que la Regla 10(D) de Evidencia, 32 L.P.R.A. Ap. IV, R. 10 (D), establece que “[l]a evidencia directa de un testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que por ley u otra cosa se disponga”. Además, la Regla 10 (H) de dicho cuerpo de ley dispone que “[c]ualquier hecho en controversia es susceptible de ser demostrado mediante evidencia directa o mediante evidencia indirecta o circunstancial”. Esta regla también dispone lo siguiente: “[s]e entiende por evidencia indirecta o circunstancial aquélla que tiende a demostrar el hecho en controversia probando otro distinto, del cual -en unión a otros hechos ya establecidos-, puede razonablemente inferirse el hecho en controversia”.
Dicho lo anterior, debemos tener presente que es norma jurisprudencial reiterada, tanto en causas criminales como civiles, que las determinaciones de hechos y la adjudicación de credibilidad que hace un tribunal de *1171 primera instancia son merecedoras de gran deferencia por parte de los tribunales apelativos. Un tribunal apelativo, de ordinario, no debe intervenir con las determinaciones de hechos ni con la adjudicación de credibilidad que ha hecho el juzgador de los hechos, salvo que haya mediado pasión, prejuicio, parcialidad o error manifiesto. In re: Ruiz Rivera, 168 D.P.R. _ (2006), 2006 J.T.S. 116; Álvarez de Choudens v. Rivera, 165 D.P.R. _ (2005), 2005 J.T.S. 90; López Delgado v. Cañizares, 163 D.P.R. _ (2004), 2004 J.T.S. 165; Pueblo v. Maisonave, 129 D.P.R. 49, 62-63 (1991). El fundamento de mayor peso en que se apoya esta norma es que dicho juzgador es el que, de ordinario, está en mejor posición para aquilatar la prueba testifical, ya que fue el que escuchó y vio declarar los testigos. Pueblo v. Irizarry, 156 D.P.R. 780 (2002).
Mediante su señalamiento de error, el señor Hernández cuestiona la apreciación que realizara el TPI, al determinar que la prueba testifical presentada por el Ministerio Público estableció de manera prima facie los elementos de los delitos de asesinato en primer grado y posesión y uso de armas blancas y conectó al acusado con la comisión de éstos.
Al examinar la Resolución dictada por el foro de instancia y la transcripción de la vista celebrada, se impone que concluyamos que el TPI no abusó de su discreción, ni incurrió en error manifiesto que amerite que alteremos su determinación de declarar no ha lugar la desestimación solicitada. En primer término, debemos reaccionar a la alegación del peticionario a los efectos de que de ninguna manera se le ha relacionado como el probable autor de los delitos imputados y que por tanto existe total ausencia de prueba sobre ese extremo. Sin ánimo de juzgar en esta etapa la suficiencia de la prueba a ser presentada en el juicio en su fondo, no hay duda de que el Ministerio Público presentó prueba suficiente que tiende a conectar al señor Hernández con los delitos por los que se le acusa para efectos de la determinación de causa probable en etapa de vista preliminar. Basta sólo con mencionar el testimonio de los agentes Luis Vélez Borrero y Marcos Irizarry Mercado, quienes lo ubicaron en la escena del crimen, en actitud de abandonar a la víctima y cuya sangre llevaba en su ropa. Igualmente, basta con el testimonio del agente investigador de la División de Homicidios, Ramón Mendret Segarra, para determinar que es probable que fueran cometidos los delitos de asesinato en primer grado y posesión y uso de armas blancas. De su testimonio se desprende claramente que la víctima (Ignacio) fue asesinada mediante múltiples heridas punzantes, producto del uso de un arma blanca; lesiones que fueron propiciadas intencionalmente, ya que hubo ausencia de marcas que reflejaran el alegado altercado entre la victima y una tercera persona ubicada en la parte posterior del vehículo, como le quiso hacer creer a éste el peticionario.
Esa prueba satisface las exigencias evidenciarías de la Regla 23, según antes examinadas. En la etapa de vista preliminar no se le requiere al Ministerio Público presentar prueba que demuestre más allá de duda razonable la comisión del delito. Tal obligación está reservada para el juicio en su fondo. Al amparo de la Regla 23 de Procedimiento Criminal, se requiere prueba capaz de conectar al acusado con el delito imputado bajo criterios de probabilidad.
El TPI no actuó de manera caprichosa o en ausencia de toda prueba al determinar causa probable contra el señor Hernández, por lo que no se infringió la Regla 64 (P). Tal determinación descansó en prueba adecuada para esa etapa del Procedimiento Criminal, por lo que no existe justificación para intervenir y alterar ese dictamen. Además, no podemos perder de vista que el mejor mecanismo que tiene un acusado para revisar una determinación de existencia de causa probable de que se cometió el delito imputado lo constituye la pronta ventilación del juicio. Tribunal Superior, supra, a la pág. 459.
Por lo tanto, concluimos que no incidió el foro de instancia al decretar Sin Lugar la moción de desestimación de la acusación al amparo de la Regla 64 (P), presentada por el peticionario. En consecuencia, se deniega la expedición del auto solicitado.
*1172 Así lo pronunció el Tribunal y lo certifica la Secretaria.
María E. Pérez Ortiz
Secretaria del Tribunal de Apelaciones
ESCOLIOS 2007 DTA 61
1.Ésta identificó en Sala al peticionario como la persona a quien se refirió hasta entonces como Lalo.
2.En la Resolución sobre vista preliminar para determinar causa probable para acusar, el TPI anotó como una de sus observaciones que el aquí peticionario se encontraba “bajo la fianza prestada”.
3.Los pliegos acusatorios incluyeron una alegación de reincidencia, haciendo referencia a una convicción previa por homicidio involuntario.
4.Tómese en cuenta que para establecer una convicción por uso ilegal de un arma, no es indispensable presentar el arma en evidencia.